UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-12088-RGS

AMERICA'S GROWTH CAPITAL, LLC d/b/a AGC PARTNERS

v.

PFIP, LLC d/b/a PLANET FITNESS

FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER AFTER A JURY-WAIVED TRIAL

December 19, 2014

STEARNS, J.

Based on the credible testimony and exhibits offered at trial, as well as the stipulations of the parties, I make the following findings of fact.

BACKGROUND

1. Founded in 1992, defendant Planet Fitness is a national gymnasium franchise.[1] Michael Grondahl, his brother Marc Grondahl, and Christopher Rondeau were the sole owners of Planet Fitness from its inception until November 8, 2012, when the October 23, 2012 agreement to sell Planet Fitness to TSG Consumer Partners (TSG) was consummated.

---

[1] I will refer to Michael Grondahl, who was the CEO of Planet Fitness, by his last name only, and Marc Grondahl (who played a minor role in the events leading to the lawsuit) by his full name.

2.     Plaintiff AGC Partners is a 50-person boutique investment bank with offices in London, Boston, New York City, San Francisco, and Minneapolis.  It was co-founded in 2003 by Ben Howe, who is AGC's CEO and the Head of Investment Banking for AGC's Boston office.   Howe has more than twenty-five years of experience as an investment banker.  During his career, Howe has participated in over 300 mergers and acquisitions.[2]

3.     Richard Moore was the General Counsel and Executive Vice President of Planet Fitness from July 23, 2012, through November 8, 2012. Prior to joining Planet Fitness, Moore was an associate attorney in the Private Equity Group at Ropes & Gray, LLP, where Planet Fitness was a client.  Moore reported directly to Grondahl, and served as the point-of-contact on contractual matters relating to the sale of Planet Fitness.[3]

4.     David Kirkpatrick worked as an independent financial consultant for Planet Fitness from September of 2011 through November of 2012. Kirkpatrick "spearheaded the mini-auction process" that resulted in

---

[2] Tr. Day 1 (Howe) at 156-157.

[3] Tr. Day 1 (Howe) at 33; Tr. Day 2 (Kirkpatrick) at 112; Tr. Day 3 (Moore) at 92-93; Tr. Day 4 (Grondahl) at 15, 21-22.

the sale of Planet Fitness to TSG from an office at Planet Fitness where he worked some forty to fifty hours per week.[4]

5.     Craig Benson is a former Governor of New Hampshire who served as a member of an informal "advisory board" that counseled Grondahl on business matters.  After the sale of Planet Fitness to TSG, Benson became a member of the new company's Board of Directors.[5]

6.     Russell Workman, Lenny Li, and Jason Coppersmith were AGC employees who helped package the sale of Planet Fitness.  Workman and Li worked as project managers, while Coppersmith served as an analyst.

7.     In the spring of 2012, Planet Fitness began discussions with two competing companies, The Invus Group (Invus) and Equinox Holdings Inc. (Equinox) regarding the sale of Planet Fitness.[6]  By July of 2012, Grondahl and his co-owners had soured on the negotiations.  Grondahl in particular

---

[4] Tr. Day 2 (Kirkpatrick) at 151; Tr. Day 3 (Moore) at 81-82; Tr. Day 4 (Benson) at 83; *see also* Tr. Day 2 (Kirkpatrick) at 104-106; Ex. 152 (October 16, 2012 Moore email).

[5] Tr. Day 4 (Benson) at 78-81.

[6] The owners of Planet Fitness had twice previously sought to sell the company (in 2008 and 2010) in auctions overseen by William Blair & Company (William Blair).  Tr. Day 4 (Grondahl) at 8, 31-32.

believed that the offers tabled by Invus and Equinox, both below $400 million, seriously undervalued Planet Fitness's true worth.[7]

8.     With Grondahl's permission, Benson and Kirkpatrick approached Howe in July of 2012, to enlist AGC in the quest for additional suitors.  Benson and Kirkpatrick, the former CEO and CFO, respectively, of Cabletron, had worked with Howe previously and thought highly of his abilities.[8] During an initial call, Benson told Howe that "the founders of Planet Fitness were frustrated, didn't trust bankers, and were hesitant to hire any banker at this stage because of their failures in the past and were looking, if they did do something, to move very quickly."[9]

9.     On July 17, 2012, a first meeting with AGC took place at Planet Fitness's headquarters in New Hampshire.  Benson, Kirkpatrick, Grondahl, Marc Grondahl, and Moore attended for Planet Fitness, while AGC was represented by Howe, Li, Coppersmith, and Elizabeth Cieri (an AGC intern).  Grondahl emphasized his desire to avoid wasting time with lukewarm prospects and to conclude a deal in 2012, before the expected

---

[7] Tr. Day 4 (Grondahl) at 34.

[8] Tr. Day 2 (Kirkpatrick) at 105-106.

[9] Tr. Day 1 (Howe) at 24.

4

increase in the capital gains tax.[10]  To this end, Kirkpatrick was identified as the Planet Fitness team member "running point" on the financial side, including business operations, due diligence, and financial modeling.[11]

10.    On July 18, Howe followed up with a "pitch letter" email to Planet Fitness outlining the "AGC Gameplan."  Ex. 6.  In the email, Howe proposed that AGC be compensated by (1) a "$100K non-creditable" retainer; (2) a financing fee (noting "[a]lthough we would normally charge 1.25%, we will drop it to 0.75% because of the relationship with Craig and David . . . ."); and (3) a success fee (of .05% "for a transaction consummated with a public shell and 0.75% +3% above $450M for a transaction consummated with any other party").  *Id.*  Kirkpatrick asked Howe to hold off until the Planet Fitness owners made a decision about the Invus offer (Planet Fitness was under an exclusivity agreement with Invus at the time). During the next week, Howe emailed Benson, Kirkpatrick, and Grondahl touting his engagement, writing that "[a]t a minimum I should be good for

---

[10]  Tr. Day 1 (Howe) at 25; Tr. Day 4 (Grondahl) at 37; Grondahl Dep. at 37-38; *see also* Tr. Day 4 (Grondahl) at 10; Tr. Day 4 (Howe) at 30 ("[T]he basic mandate was to go find us a deal in 60 days . . . .").

[11]  Coppersmith Tr. Dep. at 10; *see also* Ex. 152 (Moore email acknowledging that Kirkpatrick "spearheaded" the auction process); Tr. Day 3 (Moore) at 188-189; Tr. Day 2 (Kirkpatrick) at 111-112.

leveraging up the price 20%. . . . [W]hen I sold SS&C to Carlyle Group . . . [I] sold the company for 18x EBITDA[12] at $1B."[13]

11.     On July 27, 2012, the Invus exclusivity agreement expired. Grondahl wrote immediately to Howe, asking him to "go get me the 18x[.] [O]ur [I]nvus deal is not looking good and our exclusive is up."[14] Howe responded to the email one minute later stating, "I'm ready to rock and roll. When can you meet?" Grondahl replied, "[I] am away for 10 days [so] you will need to work thru [K]irkpatrick." *Id.* Howe wrote back asking if Grondahl had "5 minutes for a call this afternoon." Grondahl replied, "I'm at an MX race in Tennessee I won't b[e] around till a week from [M]onday."[15] Howe then contacted Kirkpatrick who told him to limit the initial Request for Proposal (RFP) solicitations to a maximum of fifteen bidders.[16]

---

[12] "EBITDA" is the financial world's acronym for "Earnings Before Interest, Taxes, Depreciation, and Amortization."

[13] Ex. 9 at 2.  Joint Exhibits offered at trial are designated by number. Disputed exhibits deemed admissible by the court are designated by letter.

[14] *Id.* at 2 (ellipses in original).

[15] *Id.* at 1.

[16] *See* Ex. 10; *see also* Ex. 11 (email forwarded from Kirkpatrick to Howe containing an exchange between Kirkpatrick and David Fine at Ropes & Gray regarding the Ropes private equity clients that Fine intended

12.     On July 31, Howe emailed Kirkpatrick, enclosing a copy of a "cover note that I will be sending out tomorrow morning to the PE firms," together with a list of the fifteen firms he proposed to contact.[17]   Howe added that "[w]e'll shoot you a draft engagement letter tomorrow on the hopes that Mike wants to drive a full-scale sale process starting next week." *Id.*   Kirkpatrick told Howe that Moore would review the proposed Engagement Letter for language and potential conflicts of interest.[18]

AUGUST 1 – AUGUST 17, 2012

13.     On August 1, AGC began contacting the fifteen private equity firms that Howe had listed in his email to Kirkpatrick.[19]   The same day,

---

to solicit.   "TSG Consumer Partners" was listed as a client that Ropes was "not contacting."   Kirkpatrick also told Howe that Ropes & Gray would assist AGC with AGC's auction process (providing a terms sheet and the minimum acceptable opening bid).

[17] Ex. 12.

[18] Ex. 14 at 2.

[19] *See* Ex. 12.   These firms consisted of: (1) Huntsman Gay, (2) TA Associates, (3) Golden Gate, (4) TPG, (5) Ares, (6) THL, (7) Weston Presidio, (8) Advent, (9) Berkshire, (10) Goldman Sachs, (11) KKR, (12) One Equity Partners, (13) Summit Partners, (14) Carlyle Group, and (15) Providence Equity.

Howe spoke with Moore and mailed him a draft of the Engagement Letter.[20]

14.    Between August 1 and August 17 (when the Engagement Letter was finally executed), AGC reached out to some twenty potential investors on behalf of Planet Fitness, generating interest from at least fourteen of them.  With these fourteen, AGC coordinated data room access, created and delivered management presentations and valuation guidance, scheduled WebEx and in-person meetings, and secured Non-Disclosure Agreements (NDAs) from eleven of the potential bidders.[21]

15.    Between August 1 and August 17, Planet Fitness and AGC also negotiated the terms of the Engagement Letter, with Howe and Moore exchanging nine different drafts.[22]   Benson participated briefly in an attempt to persuade Howe to lower AGC's requested fee, but took no part in the negotiations over the other material terms of the Engagement Letter.[23]

---

[20] *See* Ex. 17.

[21] *See* Ex. 42 at 1 (August 14, 2012 Process Update); Ex. 55 at 2-3 (August 16, 2012 Process Update).

[22] *See* Ex. 17; Ex. 26; Ex. 31; Ex. 33; Ex. 37; Ex. 45; Ex. 48; Ex. 49; Ex. 52; Tr. Day 1 (Howe) at 33; Tr. Day 3 (Moore) at 92-95; Tr. Day 4 (Grondahl) at 15-23.

[23] Tr. Day 4 (Benson) at 85-87.

Grondahl testified that his involvement was limited to a review of Exhibits A and B of the final draft.[24]

16.     Howe based his initial August 1 draft of the Engagement Letter on AGC's standard sell-side commitment contract.   On behalf of AGC, Howe proposed that his firm be paid a Strategic Transaction Fee of 0.75% of the Aggregate Consideration for Planet Fitness up to $450 million, plus 3% of any portion of the Aggregate Consideration in excess of $450 million.[25]

17.     Despite the absence of an executed contract, AGC continued to work on the RFPs.   Lenny Li, the responsible AGC project manager, emailed Moore to introduce himself with the query, "I assume we should send all proposed NDAs to you for review, but let us know if we should be sending them to somebody else."[26]   Moore replied that AGC should "send

---

[24] Tr. Day 4 (Grondahl) at 15; Grondahl Dep. at 48.

[25] Ex. 17 ¶ 2(ii).

[26] Ex. 15.

[NDA's] my way for review."[27]  He also informed Li that his full title was "Executive Vice-President & General Counsel."[28]

18.    On August 2, at 8:47 a.m., Howe emailed Moore the first of many AGC "Process Updates" describing the responses of the firms that AGC had initially approached, as well as proposing five additional equity investment firms "to be contacted."[29]  Howe wrote, "[w]e've listed 5 names in the 'to be contacted' bucket that we would like to reach out to.  Attached are their profiles.  We'll talk about these names on the call.  With your ok, we'll go out to these guys today."[30]  After a phone call between Moore and AGC, Moore responded by email, "Hey guys - I can't give you Leonard Green.  Apologies for not bringing that up on the call."[31]

---

[27] Ex. 19.

[28] *Id.* Moore acted on AGC's requests for permission to approach potential investors, approving some and rejecting others.  Tr. Day 1 (Howe) at 39.  Tr. Day 3 (Moore) at 154; Tr. Day 2 (Kirkpatrick) at 123-124.  *See, e.g.,* Ex. 20 ("I can't give you Leonard Green"); Ex. 58 ("Gores is a definite no"); Ex. 42 ("Ben – pls hold on reaching out to any new PE shops.").

[29] Ex. 20.  The "to be contacted" parties included Apollo, Clayton Dubilier, CVC, Hellman and Friedman, and Leonard Green.  The fifteen parties already contacted were listed as either "Reviewing" (7), "Contacted" (6), or "Not Interested" (2).  Invus was listed as "On Hold."

[30] *Id.*

[31] Ex. 20 at 1.

19.     On August 5, Howe sent Planet Fitness another Process Update listing several parties as "interested," including TA Associates, Huntsman Gay, Golden Gate, and Texas Pacific Group (TPG).[32]   On August 6, Grondahl responded, "[t]o save time, Golden Gate, Huntsman Gay, TA [Associates], and TPG should be disqualified.  We have either been down the path or are too small."[33]  Howe responded by asking, "Do you have any time tomorrow morning to go through the current set of private equity firms?"[34]

20.     Howe also wrote separately to Moore and Kirkpatrick on August 6, requesting an executed copy of the Engagement Letter.[35]   Moore then emailed Grondahl, "Ok to sign engagement letter with Ben?," informing

---

[32] Ex. 23.

[33] *Id.*

[34] Ex. 23. Grondahl did not respond to this email.  The next day (August 7), Howe emailed another Process Update, listing TA Associates, Huntsman Gay, Golden Gate, and TPG as "interested."  Ex. 24.  Grondahl wrote back, "TA, Huntsman Gay, TPG, and 1 other should be eliminated."  Ex. 27.  Those companies, including Huntsman Gay and TA Associates, continued however to appear on subsequent Process Updates, and Planet Fitness had management meetings with them as well.  *See, e.g.,* Ex. 55 (August 17 Process Update showing TA Associates as the "#1" name on the "interested list"); *see also* Tr. Day 1 (Howe) at 59-60.

[35] *See* Ex. 25 ("David and Richard, Sounds like everybody is aboard now to drive multiple PE bids.  If that's the case, can you send back the engagement letter? If not, obviously let me know.").

Grondahl that Howe "wants 0.75% fee plus 2.5% for any amounts above $450m."[36]  Grondahl responded to Moore fifteen minutes later with the instruction, "Only for the firms he has listed[,] and Bain is .75 regardless of the value because he didn't really bring them to the table.  You realize this may totally f[---] the Invus deal up?  I'd like to see his list before we sign anything."[37]

21.     On August 7, Moore wrote back to Howe, requesting, among other changes in the Engagement Letter, that the "[d]efinition of Strategic Transaction [be] limited to the list of PE shops – please add exhibit."[38]

22.     Later that day, Howe responded to Kirkpatrick and Benson with a second draft of the Engagement Letter, with the following cover note.

> Help me get this engagement letter put to bed today. . . . We can agree to limit the scope of the engagement to a list that we have attached to our engagement letter, but obviously if anyone else approaches the company, that party would be added to the list.  Because we're already giving a significant discount on the fee, we wouldn't want Bain or anyone else

---

[36] Ex. I.

[37] *Id.*

[38] Ex. 25.  Moore also noted that "[w]hile you have Bain on your list, Ropes approached Bain and we have a NDA for them already.  We are comfortable allowing you to include them on your list but with no increased percentage over $450mil (only the .65%).  Please make this change in the engagement letter."  *Id.*

further reduced.  We've attached that list as Annex B to the engagement letter.[39]

Howe suggested modifying the "Term and Termination" section of the August 7 draft as follows:

> **5.    Term and Termination**: . . . AGC will continue to be entitled to . . . (ii) its full Strategic Transaction Fee provided for herein in the event that . . . the Company consummates or enters into an agreement providing for a Strategic Transaction **with a party contacted by or which contacted AGC, contacted by or which contacted the Company or its affiliates or agents, or which had communications with AGC, the Company or its affiliates or agents, prior to the expiration or termination of this engagement**;
> . . . .
> An initial list of potential Strategic Partners is set forth in Annex B hereto and made a part hereof.  The parties agree that each will provide the other, upon the expiration or termination of this agreement, with a list of any party contacted by or which contacts it or its affiliates or agents, or which had communications with it or its affiliates or Agents, during the term of this engagement, which list shall supplement and become part of Annex B upon such delivery to the other party. **The parties agree that the purpose of Annex B is to assist in the administration of this agreement and failure by the Company or its agents to include a person or entity on the list as required does not affect the Company's obligations under this Section 5.**  The confidentiality provisions set forth in Section 8 hereof shall also survive any termination or expiration of this agreement.[40]

---

[39] Ex. 26.

[40]  *Id.* at PFIP004436 (emphasis added) (underlining reflects additions to the prior draft of the Engagement Letter).

Annex B contained a list of "initial potential Strategic Partners." All of Howe's proposed additions to Paragraph 5 were removed from the final draft of the Engagement Letter.

23.  Moore submitted the draft of Annex B to Grondahl, who crossed four names (TA Associates, Huntsman Gay, Golden Gate, and TPG) off the list.[41]  Moore relayed Grondahl's deletions to Howe by telephone.  Howe objected to the names being struck.  Moore agreed to leave the names on the list for the time being and to revisit the issue with Grondahl.[42]  Moore (with Kirkpatrick's support) told Howe "to continue full speed ahead on those names," and that "it was a matter of bringing those parties to a serious bid, and if we did, they would let Mike [Grondahl] know . . . that we'd overcome whatever his issue was."[43]

24.  At 4:20 p.m. on August 8, Howe sent Moore a third draft of the Engagement Letter, with the assurance that, "We modified the successes fee to 0.95% and eliminated the kicker," and noting that the list of potential prospects remained attached, "but obviously if anyone else approaches the

---

[41] Tr. Day 3 (Moore) at 115-118.

[42] Tr. Day 3 (Moore) at 118-119; *see also* Ex. 28; Ex. 30.

[43] Tr. Day 1 (Howe) at 59-60.

company, that party would be added to the list."[44]   Annex B of the third draft was almost identical to the version in the second draft - "An initial list of potential Strategic Partners" — and still included Golden Gate, Huntsman Gay, and TA Associates.[45]

25.    On August 9, Howe sent another Process Update listing twelve interested parties, ten "contacted" parties, and three "passed" parties.  Ex. 32.  Howe separately provided a fourth draft of the Engagement Letter noting, "Here is what I think we agreed to – we're dropping our fee from .95% to .75% with a fee of 0.5% on a list of 7 parties to be specified as an annex to the letter . . . ."[46] The August 9 draft revised the definition of Strategic Transaction Fee so as to entitle AGC to a fee of 0.75% on consummation of a sale to *any* party, *except* for those listed on Annex B, for which AGC would be paid a smaller fee of 0.5%.[47]   Annex B still contained only one list, but now that list bore the title, "Legacy Strategic Parties,"

---

[44] Ex. 31.

[45] *Id.* at PFIP0000431OTA Associates, Huntsman Gay, and Golden Gate remained on drafts of the Engagement Letter until August 15 when Grondahl iterated his request that those three parties be removed.  TPG remained on all subsequent drafts of the Engagement Letter and on Exhibit A of the executed version.

[46] Ex. 33.

[47] Ex. 33; *see also* Tr. Day 2 (Howe) at 26-27.

identifying those parties for which AGC would only earn a 0.5% fee as opposed to its full fee.  As of August 9, only Bain appeared on this list, although there were spaces left blank for other parties to be inserted.[48]

26.    By Friday, August 10, AGC had submitted RFP packages to some 20 private equity firms and other possible investors, prompting Howe to forward another Process Update.[49]  Howe also emailed Moore and Kirkpatrick asking for an executed Engagement Letter, suggesting that "If there are still open items, let's get on the phone and talk about them."  Ex. 34.  Moore responded to Howe's email by writing, "Hey Ben, no issues; just trying to finalize with Wells the few they have and also the principals weren't all here today."[50]

27.    Three days later, on August 13, Moore responded to the Process Update stating, "Wells gets Equinox because of prior contract . . . Wells gets Apax, Onex, and Blackstone [and] Wells also gets Advent, Carlyle and Berkshire as they are 'Not Interested' in your plan.  Only fair to give Wells a

---

[48] Ex. 33 at AGC008898.

[49] The Process Update noted that thirteen parties were "interested," (including Invus), that eight of these were "under NDA," that replies were yet to be received from five others (including Apollo, CVC, GNC, Jenny Craig, and Urban Outfitters), and that seven parties were "not interested." Ex. 36.

[50] Ex. 34.

shot at them.  If you don't have an Apollo NDA executed by Friday Wells gets them.  Wells has the right to present options to us that you have not and they get those.  Please write this up and we'll execute."[51]

28.    Howe replied almost immediately by sending a fifth revised draft, noting that it was "modified . . . for us to work with Wells Fargo."[52] Howe, however, added only Apax, Equinox, and Onex to Annex B, and explained that AGC would "like to keep Blackstone out of Annex B if possible because we requested approaching them earlier and David asked us to exclude them from the launch list."[53]  He concluded with the plea to "Please send back a signed clean copy today.  Call me if there are any other issues."[54]  In the same email, Howe also proposed thirteen new "financial partners" "that we will launch to with your ok."[55]

29.    Seven minutes later, Moore wrote back, "Not sure we're on the same page.  You get .65 [fee] for those you've reached out to and [are] working with (and that's open ended for others you may reach out to and

---

[51] Ex. 36.

[52] Ex. 37.

[53] *Id.*

[54] *Id.*

[55] *Id.*

work with).  You get .5 for Bain."[56]  Moore and Howe emailed back and forth on which entities were "Wells shops" or "William Blair shops," with Moore insisting, "We aren't trying to take anything away from you; rather we just want to be realistic – if Wells has a connection that you don't then Wells should get that bite at the apple.  This is important given our tight time frame."[57]

30.    Howe simultaneously emailed Benson, Kirkpatrick, and Moore detailing the work AGC had done to that point on the Planet Fitness sale, adding, "We're now ready to get the engagement letter put to bed."[58]  Howe noted Moore's "expanded [] list of Wells names" in his proposed fee structure, complaining that "It was obviously a surprise to us on Thursday to find out that were now going to co-advise with Wells Fargo . . . ."[59]

31.    Benson addressed Howe's email later that night, omitting Howe from the addressee line and adding Grondahl, protesting that "having 12 banks all soliciting bids makes us look like NH hicks. . . . We should hire one bank not 12 and we should beat the hell out of them to get it done . . . .

---

[56] Ex. 38.

[57] Ex. 39.

[58] *Id.*

[59] *Id.*

[and] pay them on all of the deals so they want to close any [sic] one of them and be done with it."[60] Moore responded, "Understood. Will work with Ben to solidify him as lead banker."[61] Grondahl responded with the query, "I thought Wells was fired?"[62]

32. On August 14, Howe sent Moore and Kirkpatrick another Process Update and requested a telephone call to discuss a "[g]reen light on reaching out to thirteen additional private equity firms . . . ."[63] Moore responded by telling Howe to "Hold [off] on reaching out to any new PE shops. I'll call you shortly."[64]

33. Later that afternoon, Moore wrote to Howe proposing to include Apollo "on [Wells'] list," while still "appear[ing] on [AGC's] .5 list," and stating that the "final" Wells' list would include Equinox and Invus, for which AGC would receive no fee, and Apollo, Apax, Onex, and Blackstone, for which AGC would (if successful) earn a fee of 0.5%.[65]

---

[60] Ex. 41.

[61] *Id.*

[62] *Id.*

[63] Ex. 42.

[64] *Id.*

[65] Ex. 44.

34.     Howe responded an hour later with a sixth draft of the Engagement Letter, requesting that "If Mike is ok with this deal, please sign the letter and send it back."[66]   The sixth draft provided that AGC would receive a Strategic Transaction Fee of 0.75% for a completed deal with "any of the parties listed in Exhibit A" and a fee of 0.5% for "any of the parties listed in Exhibit B."   This was the first of Howe's drafts of the Engagement Letter to include the Exhibit A and Exhibit B lists.   In the cover letter accompanying the draft, Howe wrote, "We have amended the engagement letter so that AGC is paid nothing for a deal with Invus, only 0.50% for the names on Exhibit B managed by Wells Fargo and William Blair and 0.75% for the AGC list plus any names you add to it in writing.   We are going to trust that you are going to take care of us.   Our understanding is that if some other company enters the hunt, that you would add them to Exhibit A."[67]

35.     Howe acknowledged in his trial testimony that the August 14 draft was intended to reflect the fact that Planet Fitness had negotiated to

---

[66] Ex. 45.

[67] *Id.* After Moore responded favorably with some minor suggestions – "I think this will work with the following tweaks," Ex. 47 – Howe sent Moore a seventh draft on August 15 at 10:36 a.m.  Ex. 48.

remove the "open-ended fee arrangement in the August 13th draft and replace it with Exhibit A and Exhibit B."[68]

36.  On August 15, at 4:55 p.m., Moore informed Howe that Grondahl was "pretty insistent on the following plan:  Equinox and Invus – 0.  All others on Exhibit B: .5 if at or over $500mil; if below $500mil = 0."[69] Moore further stated,

> [Grondahl] also doesn't believe the following should be on Exhibit A: GNC Holdings; Golden Gate Capital; Goldman; HIG; Huntsman Gay; Providence; TA Associates; Vitamin Shoppe.  I know that you have already reached out and led the effort on some of the PE shops we've excluded from [Exhibit] A (Mike believes they aren't large enough to do the deal).  If they do come through and actually become players we will put them back on the list. We are NOT looking to add them to anyone else's list.[70]

All of the eight parties identified for exclusion by Moore were parties that AGC had previously solicited.[71]

37.  On August 15, at 7:17 p.m., Howe sent an eighth draft of the Engagement Letter, adding a $450 million threshold to Exhibit B and

---

[68] Tr. Day 2 (Howe) at 30.

[69] Ex. 49.

[70] *Id.* (emphasis in original).

[71] Tr. Day 1 (Howe) at 58-59.

removing five of the eight parties identified for exclusion by Moore from Exhibit A (Howe did not remove the three other parties identified by Moore – Golden Gate, Huntsman Gay, and TA Associates).[72]  Howe wrote:

> [t]his engagement letter is brutal. I would love to solidify the relationship and put the engagement letter to bed, but **I think I need to talk to Mike [Grondahl] directly or meet with him**.  On Equinox and Invus, we will agree to take no fee.  On all others on Exhibit B, we will agree to 0.5% with the hurdle at $450 million.  On those that we have gotten engaged with at some level – **Golden Gate, Huntsman Gay and TA – we need those to be on Exhibit A**.  Let Mike know that we have busted our butts and **this is a highly unusual Swiss cheese engagement letter.**  If he's not comfortable with this deal, then tell him I want to come up and meet with him or just get on the phone with him.[73]

38.    On August 16, Howe wrote to Moore, Kirkpatrick, and Benson attaching a ninth draft of the Engagement Letter (signed and dated by AGC) that: (i) increased the Aggregate Consideration threshold on Exhibit B to $500 million; (ii) removed Golden Gate, Huntsman Gay, and TA Associates from Exhibit A; and (iii) added preamble language to Exhibits A and B.[74]  Howe wrote:

---

[72] *See* Ex. 49 at PFIP003867.

[73] Ex. 49 (emphasis added).

[74] Ex. 52 ("Talked to Ben – he'll agree to what Mike wanted yesterday. All good (for now).").

[h]ere's the signed engagement letter with all the terms and caveats that Mike has asked for.  I am agreeing to this extremely unusual contract with the understanding that the 3 of you will make sure that AGC is compensated well if a deal is consummated here, whether it's a player on the A or B list or not.  You guys know we jumped in, got the team in shape in short order and rallied the private equity community in the dead of the summer.  When we did all that, we understood we would probably get a below market fee (e.g., 0.75%), but we thought it would be with any party that our broader efforts generated a deal from.  So we have agreed to sign on the terms offered up by Mike, but on the presumption that you guys will speak up for us, if necessary, down the road.  Now that I've said that, let's go get a deal done at over $500M with one of the players on our A list.[75]

39.     On August 17, Grondahl reviewed and signed the ninth draft of the Engagement Letter, but struck the $100,000 retainer and handwrote "$50,000" in its place, and removed the words "payable upon execution of this agreement."  He substituted in their place the phrase, "as soon as we get an offer."[76]  Howe advised his team at AGC that the negotiation had finally been concluded, adding wistfully, "Boys, It never ends."[77]

40.     The final draft of the Engagement Letter (with the exception of the two handwritten alterations by Grondahl) was authored by Howe for AGC.

---

[75] *Id.*

[76] Ex. 50.

[77] Ex. 54.

41.     TSG was never mentioned during the negotiations over the Engagement Letter.

## THE ENGAGEMENT LETTER

42.     The Engagement Letter provided for AGC to be paid in one of two ways.  First, AGC was to receive a $50,000 Retainer Fee on receipt of a bona fide offer for the purchase of Planet Fitness.  Second, AGC would earn a "Strategic Transaction Fee" (equal to a percentage of the "Aggregate Consideration") if Planet Fitness consummated a "Strategic Transaction" with a "Strategic Partner."[78]

43.     Under the terms of the Engagement Letter, the amount of the Strategic Transaction Fee depended on the identity of the Strategic Partner.  If it proved to be one of the parties listed on Exhibit A, the fee to be paid was 0.75% of the Aggregate Consideration.  If the Strategic Partner was listed on Exhibit B *and* the Aggregate Consideration was at or exceeded $500 million, the fee would amount to 0.5% of the Aggregate Consideration.  If the Strategic Partner turned out to be Invus or Equinox, no fee at all was to be paid.[79]

---

[78] Ex. 50 ¶¶ 2-3.

[79] *See id.* ¶ 2(ii) ("Notwithstanding the foregoing, the Strategic Transaction Fee shall not be due or payable in the event of a Strategic Transaction consummated with The Invus Group, LLC or Equinox Holdings, Inc.").

44.    Exhibit A to the Engagement Letter listed twenty-six names and included the following preamble: "AGC and Planet Fitness may mutually agree to add names to Exhibit A, provided those names are approved in writing, whether Email or otherwise, by a member of Planet Fitness' management team."  Exhibit B of the Engagement Letter listed nine names and contained the same preamble as appeared in Exhibit A.

45.    TSG was not listed on either Exhibit A or Exhibit B of the Engagement Letter.[80]

46.    The Engagement Letter contained an integration clause, which provided as follows: "This agreement, including Annex A hereto, contains the entire agreement of the parties with respect to the subject matter hereof and supersedes and takes precedence over all prior agreements or understandings, whether oral or written, between AGC and the company."[81]

47.    The Engagement Letter also contained a no-subsequent-oral-modification clause, which provided as follows: "This agreement . . . cannot

---

[80] Stipulated Facts ¶ 11.

[81] Ex. 50 ¶ 12.

be modified or changed, nor can any of its provisions be waived, except by written agreement signed by both parties."[82]

## POST-EXECUTION CONDUCT

48.    On August 22, Howe wrote to Moore, "If any of these players that we are collectively talking to want to step up early with the financing we would absolutely do that deal.  That said, you and I agreed that if any outside players come to the table that you would let me know and get us involved.  Are you still good with that?  We will send the bid letters out later today."  Moore responded, "Definitely."[83]  Moore, however, warned that Grondahl was not open to a renegotiation of the parties' Engagement Letter.[84]

---

[82] *Id.*

[83] Ex. 56.

[84]    *See* Tr. Day 3 (Moore) at 175-176.  Planet Fitness maintains that "Mr. Moore's response confirmed prior conversations in which Mr. Moore had made clear to Mr. Howe that, while AGC could be involved with new parties, Michael Grondahl would not be inclined to amend Exhibit A or B." Planet Fitness cites Moore's testimony that, "I told him that Mike was not inclined to amend Exhibit A or B, that we could make no arrangement or no agreement on those, but that if he wanted to stay involved in those and take that risk, take that on, that he could do that."  Tr. Day 3 (Moore) at 123-124. Moore, however, also testified: [Howe] and I had spoken, that we were not going to amend Exhibit A or Exhibit B.  We were not going to have another agreement.   That if he wanted to take the risk of getting – he asked me numerous times, can I just stay involved.  He knew the [state] of play.  He said to me he knew the stay of play.   And he just wanted to be involved

49.     On August 24, Howe sent a Process Update to Moore, Kirkpatrick, and Benson.[85]  Howe made special note of "the inclusion of 6 PE funds that we'd propose reaching out to in the near term, with your OK. All 6 can write at least $250M equity check and have an interest in retail – please confirm we're good to proceed here and we'll reach out asap to get them in the mix." *Id.*  The proposed list of funds "to be contacted" consisted of: (1) Cerberus Capital, (2) Gores Group, (3) Lion Capital, (4) MidOcean Partners, (5) Prospect Capital, *and* (6) *TSG*. (Emphasis added),

50.     Moore objected, responding: "[L]et's hold off on additional 6 for now and let's whittle the [previously-contacted parties] you have to real leads or off the list."  He also told Howe that Gores Group, one of the six new names, was a "definite no."[86]  Howe disagreed stating, "The end game here is to get a bid in the 500's.  These guys are viable players.  We have

---

because he didn't want other investment banks to get those bidders and he was willing to take that.  [Exhibit 56] is him saying, we're still good with that.  You'll let us know.  And that's why we let him do that." Tr. Day 3 (Moore) at 176-177.

[85] Ex. 56.

[86] Ex. 58.

three weeks to bid date, and I would really like to get some of these players in the hunt."[87]

51.   On August 27, Moore, Kirkpatrick, Workman, Li, and Coppersmith joined in a conference call.[88]   During the call, Moore gave AGC's proposal to reach out to TSG (and other potential bidders) a green light.[89]   Amending the Engagement Letter (or Exhibit A) was not discussed.[90]

52.   Following the call, Workman reported to Howe that the new names had been acknowledged and that AGC had been given permission to

---

[87] *Id.*

[88]   During the call, Moore expressed Planet Fitness's desire to focus on the most likely bidders with the aim of narrowing the process rather than expanding it.   The AGC representatives argued that the additional names would not be a drain on Planet Fitness's management because AGC would do all of the necessary footwork and would bring a prospect in for a meeting only if AGC was confident the proposed buyer was serious.   Moore appeared to agree. Tr. Day 3 (Workman) at 18-21; Coppersmith Trial Dep. at 23-24; Tr. Day 1 (Howe) at 76-77, 162-164; Tr. Day 2 (Kirkpatrick) at 124-126.

[89] Planet Fitness Prop. Findings ¶112; *see also* Coppersmith Tr. Dep. 23-24; Tr. Day 3 (Workman) at 19-20.   Although Moore testified that he had no specific recollection of the call, Tr. Day 3 at 160-161, I credit Kirkpatrick's testimony that Moore did give AGC permission to contact TSG.   Planet Fitness does not dispute this fact, although it disagrees with the balance of Kirkpatrick's testimony on the subject.

[90] Ex. 159 (AGC's Responses to Requests for Admissions) at Request No. 7.

reach out to, among others, TSG.[91]  Howe testified that, in his view, "[T]his was no different than the previous four times that we had gotten approval. This was the same method:  We present.  They approved.  They go on AGC's approved list and become part of AGC's approved list."[92]

53.     Immediately following the call, Li prepared a revised Exhibit A to the Engagement Letter inserting TSG's name, among others, on Exhibit A.  Although TSG thereafter appeared in the Process Updates that Howe provided to Planet Fitness, the revised Exhibit A was never submitted to Moore or anyone else at Planet Fitness for approval.[93]

54.     On August 27, at 9:28 p.m., Howe sent an initial "launch note" describing an "Acquisition Opportunity" to John Kenney at TSG, attaching an NDA for TSG to sign.[94]  Kenney responded immediately, noting that he had forwarded the NDA to TSG's counsel at Ropes & Gray for review and would get it back to Howe "ASAP."[95]  Prior to August 27, TSG had not been

---

[91] Tr. Day 3 (Workman) at 20.

[92] Tr. Day 1 (Howe) at 79.

[93] *See, e.g.*, Exs. 58, 59, 61, 65, 79, 115.

[94] Ex. 63.

[95] *Id.*

solicited by any of Plant Fitness's advisors regarding the prospective sale of the company.[96]

55.   On August 28, Li sent TSG's mark-up of the NDA to Moore.[97] Moore signed the NDA on behalf of Planet Fitness in his capacity as "Executive Vice-President and General Counsel."[98]

56.   Howe subsequently kept Moore and Kirkpatrick abreast of AGC's daily communications with TSG.

57.   On August 30, at 2:05 p.m., Howe emailed Moore and Kirkpatrick (copying Workman, Coppersmith, and Li): "Attached is the contract with the original Exhibits A and B.  Listed below are additional names that we received approval on before we reached out to these parties. Please shoot back a note to confirm in writing what you've already done verbally."[99] The email listed seven names:  3i, Cerberus, Lion, MidOcean, Nutrisystem, Prospect, and TSG Consumer.[100]

---

[96] *See* Tr. Day 4 (Grondahl) at 56 ("Q: You never had any interaction with TSG prior to 2012? A. Correct."); Grondahl Dep. at 150 (AGC "got [TSG] out of the bushes"); *see also* Tr. Day 1 (Howe) at 80; Tr. Day 2 (Kirkpatrick) at 125; Tr. Day 3 (Moore) at 155, 168.

[97] Ex. 66.

[98] Tr. Day 1 (Howe) at 81; Tr. Day 3 (Moore) at 164 (Moore watched as AGC worked "night and day" with TSG).

[99] Ex. 67.

58.    Neither Moore nor Kirkpatrick responded to Howe's August 30 email.[101]  Moore testified at trial his failure to respond was deliberate; he did not think it "important" or "necessary" to debate the issue further with Howe, nor to discuss Howe's email with management at Planet Fitness.[102]

59.    After TSG signed the NDA, AGC provided TSG with a confidential Planet Fitness information package including a financial model, a management discussion and analysis, and a management presentation.  AGC also furnished TSG with a process timeline and bid request note, announcing a September 14th deadline for bids.  Throughout September, AGC was the principal point of contact for TSG.[103]

60.    During the early part of September, AGC continued to encourage potential bidders for Planet Fitness other than TSG.[104]  Howe

---

[100] *Id.*

[101] Tr. Day 1 (Howe) at 84.

[102] Tr. Day 3 (Moore) at 167-168.

[103] *See* Tr. Day 2 (Kirkpatrick) at 127-128; s*ee also* Ex. 68 at 7 ("TSG Consumer sent information package"); Ex. 71 at 1; Ex. 69 at 2.

[104] Tr. Day 1 (Howe) at 85-92; Ex. 71.

detailed these efforts in his periodic Process Updates to Planet Fitness's management.[105]

61.     Under AGC's auspices, TSG participated in conference calls, including an introductory Web/Ex with the management of Planet Fitness, to answer TSG's first round of due diligence questions.[106]  On September 8, TSG participated a follow up conference call arranged by AGC,[107] as well as several subsequent calls concerning Planet Fitness's financials.[108]

62.     On Monday, September 10, Howe participated in a call with TSG representatives (including Pierre LeComte) to discuss the bid that was then due in four days.[109]  Howe emailed Kirkpatrick and Moore (copying Benson)  afterwards  recounting  salient  aspects  of  the  call  and

---

[105] *See, e.g.,* Ex. 85; Tr. Day 1 (Howe) at 87; Ex. 79.

[106] *See* Ex. 69; Ex. 70.  A Web/Ex is a conference call during which slides and other information are simultaneously transmitted by computer while the participants speak.  Tr. Day 1 (Howe) at 44; Coppersmith Tr. Dep. at 20.

[107] Ex. 74; Exs. 72-73 (due diligence requests from TSG); Coppersmith Tr. Dep. at 24-25.

[108] Coppersmith Tr. Dep. at 26; Ex. 77.

[109] Tr. Day 1 (Howe) at 88-89; Ex. 85.

recommending a briefing for TSG by Kirkpatrick. The briefing, in which AGC participated, took place midday on Tuesday, September 11.[110]

63.    Later that day, at 3:27 p.m., Howe forwarded a Process Update to Planet Fitness listing the "next steps" to be taken with fifteen interested parties, and noting that four of the parties (THL, TSG, Kelso, and Huntsman Gay) were "confirmed bidding on Friday."[111] Moore responded at 3:55 p.m. by email, "[L]ooks like key focus is on THL, TSG, Kelso and HGGC [Huntsman Gay], right? Any chance we could get a ballpark range (i.e., 'around 400' or 'mid 400s' etc.) for them – even if you don't go to them but you have insight, it would be ***extremely*** helpful to have that information today."[112]

64.    On Wednesday, September 12, at 5:17 p.m., Moore emailed AGC's Coppersmith forwarding slides "for the TSG Diligence," noting "[j]ust making sure you got this and it gets to TSG. My Ropes connections are working with them and they are putting in a bid at $450 today."[113] Coppersmith forwarded the email to Workman and Li; Workman then

---

[110] Exs. 85, Ex. 78.

[111] Ex. 80.

[112] *Id.* (emphasis in original); Tr. Day 3 (Moore) at 179-180.

[113] Ex. 82.

forwarded it to Howe at 5:50 p.m., complaining that, "Given all the work we've done with these guys this week, it's annoying to see Richard characterize this as Ropes bringing them in."[114]

65.    Howe testified that he was "stunned" and "upset" when he saw Moore's email, and that he had immediately contacted David Fine, a Ropes & Gray attorney working with Planet Fitness.[115]  According to Howe, Fine informed him that, "Richard [Moore] told me to go do this" [contact TSG directly about the bid].[116] Fine assured Howe that it would not happen again.[117]

66.    Howe also called TSG's LeComte, who told Howe that he had been surprised by the call from Fine at Ropes.  LeComte also disclosed that Fine had told him to send TSG's bid letter directly to Moore and Ropes & Gray,  bypassing AGC.[118]

67.    At 6:54 p.m. on September 12, about an hour after seeing Moore's email, Howe wrote to Moore, Benson and Kirkpatrick, reporting "a

---

[114] Ex. 83.

[115] Tr. Day 1 (Howe) at 93; Tr. Day 3 (Workman) at 26-27.

[116] Tr. Day 1 (Howe) at 94.

[117] *Id.*

[118] Tr. Day 1 (Howe) at 94-95.

great call with Pierre at TSG."[119]  He stated that TSG would submit a bid by the end of the day and  that "[t]heir valuation will be well into the 4's and . . . we could get them into the high 4's, or maybe even 500, with a little work." Howe added that "TSG was not on anybody's radar screen when we brought the name to you . . . and you gave us the go ahead to reach out to them."[120]

68.    Moore responded to Howe's email six minutes later, at 7:00 p.m., writing, "We've been talking extensively with them through [TSG's] attorneys at Ropes.  They are serious and are coming in at 450.  We should get the letter tonight.  We'll let you know once we receive it."[121]  Moore did not reply to Howe's assertions about AGC's role in bringing TSG into the bidding.

69.    On Wednesday, September 12, at 7:46 p.m., LeCompte emailed Moore an "Indication of Interest," copying Howe and Workman, and also Byron and Van Houten at Ropes & Gray.[122]  The Indication of Interest stated, "TSG would value Planet Fitness at $435 million to $480 million. This equates to 7.0x − 7.75x the Company's calendar year 2012 estimated

---

[119] Ex. 85.

[120] *Id.*

[121] *Id.*

[122] Ex. 86.

pro forma EBITDA of $62 million which includes company identified pro forma adjustments . . . . TSG believes a transaction at the higher end of this range . . . is feasible assuming all EBITDA adjustments . . . can be verified."[123]

70.    Immediately after TSG submitted its Indication of Interest, Moore sent an email invitation to AGC to meet with a Planet Fitness financial officer regarding the TSG offer.[124]  Moore also wrote to AGC, "Let's get a Huntsman Gay bid in too and we'll be rockin'.   Great work!"[125] (Huntsman Gay also was not listed on Exhibit A of the Engagement Letter).[126]

71.    Ultimately, six of the investment firms solicited by AGC – TSG, TA Associates, Thomas H. Lee, Kelso, Ares, and Huntsman Gay -- submitted bids by the September 14 deadline "in the 450 [million] to 500 range."[127, 128]

---

[123] *Id.* at AGC0022145.

[124] Ex. 87 ("[C]an you guys meet with David Smith tomorrow morning to get a real clear understanding of how we think TSG is getting to $62mil EBITDA.").

[125] *Id.*

[126] Tr. Day 3 (Moore) at 178.

[127]  Tr. Day 1 (Howe) at 96-97, 104.

72.    At 11:05 a.m. on September 14, Howe sent Planet Fitness managers and owners (including Grondahl) a "Board Update" boasting that "[y]our boys at AGC have been working hard over the last 6 weeks . . . reaching out to over 40 leading PE firms, 18 management meetings with poor [Rondeau] and [Kirkpatrick], we now have 10 great PE firms vying to buy the business . . . ."[129]   Howe asked that a meeting be scheduled on Monday at the Planet Fitness headquarters and attached a proposed agenda.

73.    Moore responded to Howe a few minutes later, at 11:22 a.m., with the warning, "You are wearing thin with MMC.[130]  Please call Benson ASAP."[131]

74.    Howe attempted unsuccessfully to reach Benson, and then called Moore.  During the call, Moore stressed that TSG had never been

---

[128]  *See* Ex. 89 (Sept. 13 email); Tr. Day 3 (Moore) at 182-183.

[129] Ex. 90.

[130] MMC was a shorthand reference to "Michael, Marc, and Chris," the individual owners of Planet Fitness.

[131] Ex. 92. Before writing to Howe, Moore emailed Li and Coppersmith asking them to work with Planet Fitness's accounting teams to "make sure we are straight with our numbers." Ex. 93.

added to Exhibit A of the Engagement Letter.[132]  Moore told Howe that if AGC would agree to lower its fee for the parties on Exhibit A from .75% to 0.65%, he would amend the Engagement Letter to include TSG, Huntsman Gay, and the others.  Howe objected, reminding Moore that he had given AGC oral approval to approach TSG in August, and that he regarded Moore's fee reduction request to be a bad faith "bait and switch."[133]

75.    Howe immediately called Kirkpatrick and related the conversation with Moore.  According to Howe, Kirkpatrick told him, "Ben, that's not the deal . . . those companies were approved by me and Richard Moore.   You worked them.   You're going to get your fee on those companies, and I will talk to Craig Benson and the founders, and we'll deal with" Moore.[134]  Kirkpatrick added, "[I]f it comes down to it, I'll stand up in court and tell the judge these were approved buyers and you get your fee."[135]  When Howe finally reached Benson, he was cautioned not to "blow up the deal" over the fee.[136]

---

[132] Tr. Day 3 (Moore) at 145-146; Tr. Day 2 (Howe) at 63-65.

[133] Tr. Day 1 (Howe) at 103-104.

[134] Tr. Day 1 (Howe) at 105.

[135] *Id.* at 107; *see also* Tr. Day 2 (Kirkpatrick) at 130-132.

[136] Tr. Day 1 (Howe) at 106.

76.     On Sunday, September 16, at 11:15 a.m., Moore emailed AGC with a more detailed agenda for the September 17 meeting and a cover note: "The purpose/agenda of the meeting will be as follows: 1. Review the contractual engagement we have with you. 2. AGC's role going forward . . . . 3.  Hear your thoughts on the [bidders] under contract with you and those who are currently working with/partially through you.  I assume you will recommend we move forward with TSG, HGGC and Ares but not THL, Kelso and TA.  MMC [wants to move forward with only] 5 or 6 <u>max</u>.  We have three PE proposals from other bankers with bids over $450 fyi."[137]

77.     At 3:02 p.m., Moore emailed Howe asking him to call, stating, "I've spoken with MMC about process and have some information to share that will assist you in preparing for tomorrow's meeting."[138]

78.     Kirkpatrick wrote to Howe the next morning, prior to the meeting, cautioning:  "Your answer to Richard – It's not what he discussed, it's not fair, and it's two of the top four bids.  You are just plan [sic] on Planet Fitness being fair and this is the wrong time to debate, this is a major event week for company and let[']s do this after [the 11:00 a.m.]

---

[137] Ex. 99 (emphasis in original).   In fact, there was only one additional bidder (Apollo).

[138] Ex. 101.

meeting please."[139] Howe responded by phone to Kirkpatrick while driving to the meeting at Planet Fitness. Kirkpatrick again urged him not to "squabble with the owners" over AGC's fee.[140] Kirkpatrick assured Howe that TSG (as well as TA and Huntsman Gay) are "your guys, and you know, you'll be covered on this, but now is not the time and place to bring it up."[141]

## THE SEPTEMBER 17 MEETING

79. Attendees of the September 17th meeting included Grondahl, Marc Grondahl, Chris Rondeau, Moore, Kirkpatrick, Benson, and the AGC team. The meeting hewed to the agenda that Howe had initially proposed and focused on the pool of bidders and the terms of a final agreement.[142] Neither AGC nor Planet Fitness raised the issue of AGC's fee.

80. At the meeting, AGC was assured that it would be involved in refining and processing the bids of the six investment firms it had brought

---

[139] *Id.*

[140] Tr. Day 2 (Kirkpatrick) at 130; s*ee also* Tr. Day 1 (Howe) at 114; Coppersmith Trial Dep. at 39-40 (Coppersmith was in the car and overheard the conversation).

[141] Coppersmith Tr. Dep. at 40.

[142] Ex. 100 at AGC 24271.

to the table – TSG, Huntsman Gay, TA Associates, Ares, Kelso, and TH Lee.[143]

81.     During the meeting, AGC was specifically instructed that Wells Fargo was working with Apollo, which was Wells Fargo's client and "not yours."[144]

82.     Following the meeting, AGC continued to work on the Planet Fitness auction and with TSG specifically, coordinating visits and responding to questions,[145] and earning Moore's praise.[146]

83.     On September 18, Howe sent Planet Fitness a "Proceeds Analysis" for a projected $450 million buyout, including an investment banking fee of $3 million (roughly 0.75% of the hypothetical purchase

---

[143] Tr. Day 3 (Workman) at 28-29; Coppersmith Tr. Dep. at 36-38; Tr. Day 1 (Howe) at 116.

[144] Coppersmith Trial Dep. at 36-37.

[145] *See* Ex. 110; Tr. Day 1 (Howe) at 120-122.

[146] Tr. Day 1 (Howe) at 128; *see also* Ex. 120 (September 20 email from Moore to Howe, "Thanks to your team for the solid work thus far.").

price).[147]  Moore responded to the analysis the next day with that the comment, "Bank transaction fees will vary."[148]

84.    On September 20, Workman learned from Moore that TSG was the leading bidder.  Workman emailed Howe noting that TSG was prepared to bid $450 million and that both it and Planet Fitness were represented by Ropes & Gray, which has "been working back channel on a deal structure already."[149]  Workman ended the email in capital letters warning, "WE REALLY SHOULD GET THE ENGAGEMENT LETTER SQUARED AWAY . . . (TSG AND TA ARE NOT ON OUR LIST IN THE LETTER)."[150]

85.    The next day, Howe wrote to Kirkpatrick:

David  . . .  It's time I get your help on the engagement letter. . . We obviously got Richard and your verbal approval [for] TSG, TA, and Huntsman Gay.  As you and I talked about . . . . There should not be a $500M hurdle [in the Exhibit B fee] after what we've done to build this value.  Can you shoot me a note back

_____

[147] Ex. 111.

[148] Ex. 113.  Howe understood Moore's comment to refer to Apollo, which was listed on Exhibit B of the Engagement Letter.  Tr. Day 1 (Howe) at 122-123. AGC's Li sent a second draft noting that he had "added a footnote with our assumption on the bank fee and can adjust accordingly." Moore responded, "Looks really good."  Ex. 117.

[149] Ex. UU.

[150] *Id.* (emphasis in original).

that says TSG, TA and Huntsman Gay are on the A list and that Apollo is on the B list with no valuation hurdle?[151]

Howe had sent a similar email to Kirkpatrick on September 15, to which Kirkpatrick had not responded.[152]

86.    TSG submitted its bid the following day, Friday, September 21, at 10:33 a.m., by email to Moore.[153]   The bid, $470 million, was well in excess of any of the competing bids.

87.    Howe emailed Planet Fitness at 12:28 p.m., requesting a conference call that afternoon.[154]   Moore responded, "No need to meet today . . . [TSG is] using Ropes attorneys so our two Ropes teams are working closely as well . . . We will keep you posted."[155]  Grondahl then also responded, at 1:04 p.m., "Ben, Please don't waste time on this deal because Ropes brought them to us.  We agreed they weren't your client upfront so I

---

[151] Ex. 121.

[152] Ex. 96.

[153] Ex. 125.

[154] Ex. 123.

[155] *Id.*

don't want any confusion when it comes time to close.  Blair originally had them meet us in 08."[156]

88.    Upon receiving Grondahl's email, Howe immediately called Benson and then Kirkpatrick.[157]    Howe also emailed Benson stating, "Richard gave us the OK some time ago.  I need you to jump in here and let Mike know how TSG came to the table."[158]    Benson said he had not been directly involved, but would speak to Kirkpatrick, to whom he then wrote, "David, You need to go see [M]ike and tell him the history.  I spoke to him and he thinks Blair brought them [TSG] in.  I have no idea how this works but I don't want to lose [TSG] because of back biting.  But we need to do the deal that was promised if [M]ike is right Ben is out if [M]ike is wrong then we need to pay him."[159]

89.    Kirkpatrick, at Howe's request, spoke to Grondahl who related that Moore had confirmed with him that Ropes & Gray had introduced TSG

---

[156] Ex. 124.

[157] Tr. Day 1 (Howe) at 131-132; Ex. 128.

[158] *Id.*

[159] Id.

to Planet Fitness and that Ropes was working with TSG on the transaction, not AGC.[160]

90.    At 1:57 p.m., Kirkpatrick wrote to Benson, "[Grondahl] and [Moore] are back on TA and TSG not being Ben's customers.  [Ben] had [Moore's] go ahead.  It is not a case of doing the right thing.  . . . I had not seen Mike's email when we spoke today.  [Moore] is lighting the fuse and walking away."[161]

91.    Later that afternoon, Grondahl, Moore, and Kirkpatrick met at Planet Fitness headquarters. The issue of whether Moore had given AGC permission to bring TSG to the table was discussed,[162] but Grondahl testified that it made no difference as TSG was not listed in Exhibit A of the Engagement Letter.[163]

92.    Kirkpatrick emailed Benson at 2:46 p.m., reporting the results of the meeting.  He wrote, "I think [M]ike is semi okay again. . . . If we can

<hr>

[160]  Tr. Day 2 (Kirkpatrick) at 133.

[161]  Ex. 126; Tr. Day 2 (Kirkpatrick) at 138.

[162]  *See* Planet Fitness Prop. Findings ¶ 136; s*ee also* Ex. 128.

[163]  *See* Planet Fitness Prop. Findings ¶ 136; Grondahl Tr. Dep. at 111-114, 119-120; s*ee also* Ex. 129.

keep Ben calm I think we are set."[164]  Kirkpatrick added, "Mike says if Ben does well he will be fair.[165]

93.     The following day, Grondahl emailed Howe with the subject-line "Kirkpatrick."   He stated that, "[Kirkpatrick] ran into the office yesterday accusing Richard of giving you permission to work with Apollo."[166]   Grondahl explained that he had "crossed them off the list because Blair had worked with them on our 1st auction and more recently an investment banker from San Fran. has been in contact with my brother over taking a meeting with TSG that is why I crossed them off as well as TA and Huntsman Gay because they were too small but you went a head (sic) anyway. . . ."[167]   (Grondahl had crossed TPG, not TSG, off an early draft of Exhibit A).[168]   "When the dust settles," Grondahl wrote, "We will sit down

---

[164] Ex. 128.

[165] *Id.*

[166] Ex. 129. Grondahl referred to Apollo several times in the email though it is undisputed that the conversation between Moore, Grondahl and Kirkpatrick concerned TSG.

[167] *Id.*

[168] In an interrogatory answer, Planet Fitness acknowledged that there is no document showing Grondahl crossed TSG off any list.

and make up our minds on who gets what."[169]  Grondahl added, "BUT if Kirkpatrick comes into my office making up shit not only will you get nothing on Apollo but so will he." *Id.*  (Emphasis in original).

94.    On September 23, Howe responded to Grondahl's "Kirkpatrick" email copying the other owners of Planet Fitness), writing, "As you said, let's let the dust settle whenever on the fees, but in the meantime, let's do what we've been doing as a team day in and day out to get this deal done at the highest possible price, and not screw it up with these fee discussions. . .. I signed up with you guys, committing to work my tail off to bring you a process that would get a great deal done and I'm honestly proud to say that we've done that and will continue to do that until this deal is done."  Ex. 131.  He then proposed a meeting by telephone to discuss the mechanics of the bid process going forward, which he proceeded to outline.

95.    Howe then forwarded Benson his email to the Planet Fitness owners with the following cover note: "I swallowed my ego and sent the following email response to Mike, Marc, and Chris.  As we talked about, we'll move forward with the same engagement terms that we have had since

---

[169] *Id.*

we were engaged and assume that the brothers will not challenge it down the road."[170]

96. On September 29, Ares, another private equity firm solicited by AGC, submitted a $500 million bid.[171] TSG in response raised its bid by $35 million to $505 million.[172]

97. On October 1, Howe emailed Benson and Kirkpatrick.[173] He wrote: "Once the dust settles and we sign with TSG today or tomorrow I need you two to take care of the fee with Mike. As both of you requested, I put Mike's confusion on what happened with the fee behind us to get the deal done."[174] Howe did not receive a response.

98. On October 2, Planet Fitness and TSG executed a Letter of Intent and term sheet incorporating the material terms of a purchase and sale agreement. TSG assigned an equity value of $480 million to Planet

---

[170] Ex. 132. Howe had sent a previous email to Benson, containing a draft response to Grondahl (detailing the August 27th phone call and explaining that Ropes & Gray only got involved at the end of the process). Ex. 127.

[171] *See* Ex. 142.

[172] Tr. Day 3 (Workman) at 30-31.

[173] Ex. 144.

[174] *Id.*

Fitness, and valued its corporate indebtedness at $20 million.[175]  Howe immediately emailed TSG management his congratulations on winning the bidding, prompting LeCompte to express his appreciation for AGC's guidance.[176]

99.    On October 5, Howe emailed AGC's "closing invoice" to Kirkpatrick, billing Planet Fitness for a Strategic Transaction Fee of $3,787,500.00.[177]  Howe added, "[A]lthough the retainer has been due for a while, we've been focused on executing and hadn't yet billed the Company for it. . . . Consistent with the engagement letter and our conversations with you and the company, this invoice reflects the strategic transaction fee of 0.75% of the aggregate consideration [$505 million], as specified in our agreement."[178]

100.  Kirkpatrick responded with a copy to Benson, recommending that Howe reduce the invoice to reflect 0.75% of the equity value of TSG's offer ($480 million) rather than the enterprise value ($505 million), and to

---

[175] Ex. 145.

[176] Ex. 146.

[177] Ex. 147.

[178] *Id.*

delete the billing for out-of-pocket expenses.[179]   Kirkpatrick wrote, "If you can take the cleanest high road approach, we will take up what was committed to AGC with Richard and then the owners."  Ex. 148.

101.   Howe responded with a revised invoice, noting that he was "happy" to make the reductions "if it brings the fee discussion to an end." Ex. 148.   The invoice now was for a total of $3,600,000.   Kirkpatrick forwarded his entire exchange with Howe to Moore at 2:18 p.m. on October 5, noting that he had asked Ben to "write off the difference between net and gross and drop his expenses to make it a little more palatable."  Kirkpatrick added, "In addition to whatever you feel you agreed to its worth noting that without the Ares bid the final $30 million and the plane would have been unlikely."  Ex. 148.

102.   On October 12, Planet Fitness paid AGC the $50,000 retainer. Ex. 151.   Howe emailed Kirkpatrick thanking him, adding, "As you requested, attached is a revised invoice which credits the retainer amount already paid by the company."  Ex. 151.

103.   On October 19, the owners of Planet Fitness exchanged emails regarding the amount of compensation to be paid Moore and Kirkpatrick for their roles in the sale to TSG.  Grondahl wrote, "I can't see giving Moore

---

[179] Ex. 148.

much with the short time he has been here. Kirkpatrick has to be tied to AGC because of the damning email."[180]

104. On October 28, Howe emailed Benson and Kirkpatrick with the subject line "Now That The Dust Has Settled," summarizing, over more than five pages, his view of AGC's instrumental role in effecting the sale to TSG and his understanding of Planet Fitness's contractual commitment to pay AGC prior to the closing.[181] Among other details, Howe wrote:

> [o]n a process update call on August 27th, AGC received verbal approval from Richard and David to approach the list of 5 new private equity firms, which included TSG. That evening, AGC reached out to those 5 parties, with the understanding that these parties would now be included in the engagement letter. As with the original outreach, these approaches were done on the basis of a verbal agreement, simply to be reduced to writing at a later time.[182]

105. After reviewing Howe's email, Kirkpatrick wrote to Benson, stating, "I suggested to Mike that whatever he wants to pay to let you handle . . . I think Ben is used to getting half on projects from you."[183]

---

[180] Ex. 154.

[181] Ex. 155.

[182] Ex. 156.

[183] Ex. 155.

106.   Benson responded to Kirkpatrick, "I have no idea what is the best to do.  I am pretty sure of this however neither you nor I negotiated any payments due besides what is in the contract.  The football player did the deal not us.  I need to speak to the guys to get them to decide what needs to be done."[184]

107.   On Friday, November 2, Howe forwarded a copy of his "Now That The Dust Has Settled" email to Grondahl and Moore, attaching a final invoice, adding, "Congrats on signing the definitive docs with TSG. . . . [L]et me know a time we can talk on Monday to put the AGC invoice to bed."[185] Moore responded on Monday, November 5, asking when Howe would "have a few minutes to talk."[186]

108.   On Tuesday, November 6, Moore "walked [Kirkpatrick] through all the pieces" of Kirkpatrick's separation agreement, which included, according to Moore, "end gig Thurs., $250k over 12 months, sign non-compete and attest that he didn't promise $$ to AGC."[187]

---

[184] *Id.*

[185] Ex. 156.

[186] Ex. 157.

[187] Ex. 158.

109. The next day, November 7, AGC's law firm emailed Planet Fitness and TSG attorneys a "courtesy copy" of AGC's instant Complaint warning that AGC "intend[ed] to file [the next day] . . . unless [it] received a written commitment that [Planet Fitness would] pay the full amount of compensation."[188] Howe responded to his attorneys, copying counsel for Planet Fitness and TSG, stating: "Thanks much. The next couple of days will be interesting on this one."[189]

110. The draft Complaint, naming Planet Fitness as the main defendant and TSG as a reach-and-apply defendant, was emailed to defendants' lawyers on November 7, the day prior to the scheduled closing. Despite the filing of this lawsuit the following day, the closing went forward as planned.[190]

### RULINGS OF LAW

---

[188] Ex. RRR.

[189] Ex. SSS.

[190] Ex. 162 at PFIP00000017-18 (defining term) & PFIP00000052-53 (sellers' obligations); s*ee also* Tr. Day 2 (Howe) at 92-95 ("So prior to closing, I wanted the buyer to be aware that we hadn't resolved this, and here are the facts in the case."); Tr. Day 3 (Moore) at 149-150; Tr. Day 4 (Grondahl) at 27-29, 74; Grondahl Tr. Dep. at 104-105.

1. A plaintiff has the burden of proving the existence of a binding contractual term. *Canney v. New England Tel. & Tel. Co.*, 353 Mass. 158, 164 (1967) ("Where the existence of a contract is in issue, the burden is on the plaintiff to show it was made."). When a preliminary agreement incorporates all of the material terms of a contract, and the execution of the final instrument is a mere formality, a binding contract is formed. *Goren v. Royal Invs., Inc.*, 25 Mass. App. Ct. 137, 140-141 (1987). Whether a document contains the elements which make it an enforceable contract is a question of law for the court. *Schwanbeck v. Federal-Mogul Corp.*, 412 Mass. 703, 709 (1992).

2. "It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878 (2000). "[I]n an ordinary contract, where matters are left open, the court may imply terms either that are reasonable or that may be gathered from the subsequent course of performance." *Lawrence v. City of Cambridge*, 422 Mass. 406, 411 (1996). As a general rule, where there is ambiguity in a contractual term, the writing will be construed against its drafter. *Merrimack Valley Nat'l Bank v. Baird*, 372 Mass. 721, 724 (1977).

3. "The integrated documents barrier may be penetrated by evidence tending to show that the documents are not, in fact, complete . . . ." *Hogan v. Reimer*, 35 Mass. App. Ct. 360, 364-365 (1993). "[E]vidence of the contract negotiations and the circumstances of its execution are always admissible to show whether the contract was intended by the parties as an integrated (i.e., final) expression of the terms of their agreement or to show the existence of any uncertainties in the contract's application." *Fred S. James & Co. v. Hoffman*, 24 Mass. App. Ct. 160, 163 (1987). As to the oral modification of a contract, "a provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract." *Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432, 439 (1992). But to support the existence of an oral modification, the parol evidence must be sufficiently weighted and of competent probity to present a material issue for trial; that is, the parol evidence must be of sufficient strength to present an ambiguity between the actual conduct of the parties and the contract. *See E. Holding Corp. v. Contress Fin. Corp.*, 74 Mass. App. Ct. 737, 742 n.5 (2009).

4. "Every contract implies good faith and fair dealing between the parties to it." *Warner Ins. Co. v. Comm'r of Ins.*, 406 Mass. 354, 362 n.9 (1990), quoting *Kerrigan v. Boston*, 361 Mass. 24, 33 (1972); *see also*

*Charick Distribs., Inc. v. Polar Corp.*, 41 Mass. App. Ct. 125, 127 (1996) (at-will distributorship contract). There is no exception for sophisticated business people. *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 473 (1992). Not every breach of contract is a breach of the covenant. *Nagel v. Provident Mut. Life Ins. Co.*, 51 Mass. App. Ct. 763, 768 (2001). "The duty of good faith and fair dealing concerns the manner of performance." *Uno Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). The covenant reflects an implied condition that inheres in every contract "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony's Pier Four*, 411 Mass. at 471-472. "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Rests.*, 441 Mass. at 385.

5. Statements that are made *before* a contract is executed are "inadequate" for a claim of breach of the implied covenant of good faith and fair dealing. *Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001) ("It is implicit in [the] definition [of the implied covenant of good faith and fair

dealing] . . . that the prohibition contained in the covenant applies only to conduct during performance of the contract, not to conduct occurring prior to the contract's existence, such as conduct affecting contract negotiations."). Affirmative acts undertaken to deliberately torpedo a contract with the intent of depriving the other party of its "fruits" will violate the covenant. *K.G.M. Custom Homes, Inc. v. Prosky*, 468 Mass. 247, 255 (2014), citing *Anthony's Pier Four, Inc.* 411 Mass. at 471-472.

6. "Only the words and conduct of the principal . . . and not those of the agent, are considered in determining the existence of apparent authority." *Licata v. GGNSC Malden Dexter LLC.*, 466 Mass. 793, 801 (2014). Where an agent lacks actual authority, the principal will be bound only if he acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts. *Linkage Corp. v. Trs. of Boston Univ.*, 425 Mass. 1, 18 (1997).

7. In order to establish a cause of action for fraud in Massachusetts, a plaintiff must demonstrate that "(1) the defendant made a false representation of material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act in reliance thereon, (4) the plaintiff relied upon the representation, and (5) the plaintiff acted to his detriment." *Armstrong v. Rohm & Haas Co., Inc.*, 349 F. Supp. 2d 71, 81 (D. Mass.

2004); *see also Reisman v. KPMG Peat Marwick LLP*, 57 Mass. App. Ct. 100, 109 (2003). It is a sine qua non of the tort that a plaintiff's reliance be reasonable under the circumstances. *Collins v. Huculak*, 57 Mass. App. Ct. 387, 391-392 (2003).[191]

8.   The demarcation of the boundaries of what qualifies as conduct violating Chapter 93A is a question of law, not fact.   *Casavant v. Norwegian Cruise Line Ltd.*, 460 Mass. 500, 503 (2011).   A mere breach of contract does not give rise to a Chapter 93A violation. *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 100-101 (1979); *Madan v. Royal Indem. Co.*, 26 Mass. App. Ct. 756, 762 (1989).  Under the test of *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219 (1992), Chapter 93A reaches only those breach of contract cases that have an "extortionate" quality.   *Framingham Auto Sales, Inc. v. Workers' Credit  Union*, 41 Mass. App. Ct. 416, 418 (1996).  A refusal to pay a bill because one disputes the amount does not give rise to

---

[191] Although Count VI of AGC's Complaint is styled "Fraudulent Inducement," the court assumes that AGC's intent was to plead fraud. Fraudulent inducement is usually understood to be an affirmative defense (requiring a showing of clear and convincing evidence) to the enforcement of a contract alleged to have been procured by fraud or deceit. *See Boston Five Cents Sav. Bank v. Brooks*, 309 Mass. 52, 55 (1941) ("One party cannot enforce a contract against another whose signature he has procured by fraud or fraudulent representations, which induced the signer reasonably to believe and understand that the instrument was substantially different from what it really was.").  Here, AGC is not attempting to avoid a contract, but to enforce the contract as AGC believes or wishes it to have been.

Chapter 93A liability. *Cf. Commercial Union Ins. Co. v. Boston Edison Co.*, 412 Mass. 545, 557 (1992). Similarly, a mere act of negligence does not give rise to a Chapter 93A violation; there must be evidence that the negligence was or resulted in an unfair or deceptive act or practice. *Patterson v. Christ Church in the City of Boston*, 85 Mass. App. Ct. 157, 163-164 (2014).

## ULTIMATE RULINGS OF FACT AND LAW

1. The Engagement Letter executed by AGC and Planet Fitness on August 17, 2012 (Ex. 50) is a valid and binding contract. Stipulated Facts ¶ 10.

2. All aspects of the Engagement Letter are governed by the law of Massachusetts. *Id.* ¶ 13.

3. The Engagement Letter was a fully integrated contract. Consequently, none of the purported oral understandings entered prior to its formal execution have any bearing on its terms and conditions.

4. The Engagement Letter, including the integration clause, was drafted by AGC.

5. AGC and Howe, in particular, were sophisticated parties with over two decades of experience in drafting engagement contracts and managing equity sales and acquisitions.

6. The Engagement Letter was not a boilerplate replication of a pre-formatted contract. It was a tailored and intensely negotiated document that was meant to memorialize the parties' respective bargaining positions.

7. The Engagement Letter, by its explicit terms, could only be modified by a writing approved by the parties, which in the case of Planet Fitness, meant one or more members of the "Management Team."

8. The Planet Fitness Management Team consisted of Grondahl and the two other owners of Planet Fitness, Marc Grondahl and Christopher Rondeau.

9. Richard Moore was not a member of the Planet Fitness Management Team, but rather a newly hired in-house lawyer of relatively modest experience. Moore's role was to serve as the designated point of contact for AGC and others involved in the marketing of Planet Fitness to potential bidders. Neither Grondahl nor any other member of the Planet Fitness Management Team said or did anything that would have led a reasonable observer to believe that Moore was acting with actual or apparent authority as the general agent of Planet Fitness's managing group.

10. At all relevant times, Howe knew that Moore did not have the authority (real or apparent) to modify the Engagement Letter without the approval of Planet Fitness's Management Team, and in particular,

Grondahl. Although Moore at times made (and would often then retract) statements of encouragement to Howe and others at AGC, to the extent that Howe and AGC relied on these statements as legally binding undertakings on the part of Planet Fitness to modify Exhibit A of the Engagement Letter (to include TSG, among others), that reliance was unreasonable.

11. Neither David Kirkpatrick nor Craig Benson was a member of the Management Team at Planet Fitness. Kirkpatrick was an outside consultant hired to develop financial and other materials to assist the marketing of Planet Fitness to potential bidders. Craig Benson was a friend and informal business advisor to Grondahl. Neither Kirkpatrick nor Benson ever represented himself to be a member of Planet Fitness's Management Team with the authority to unilaterally modify the terms of the Engagement Letter. Howe understood Kirkpatrick's and Benson's respective roles as consultant and confidant to Planet Fitness's Management Team.

12. Under the terms of the Engagement Letter, AGC was to receive a Strategic Transaction Fee (of varying magnitude) only if, among other criteria, the ultimate purchaser of Planet Fitness was one of the investment firms identified in Exhibit A to the Engagement Letter.

13.   Despite Howe's persistent efforts, Exhibit A was never modified in writing to include TSG among the bidders for whom AGC would receive the stipulated Strategic Transaction Fee.   Nor at any time was written approval given by the Planet Fitness Management Team for a reformation of the terms of the executed Engagement Letter.

14.   Planet Fitness paid AGC in full the $50,000 retainer fee that was due under the terms of the Engagement Letter.

15.   While AGC's decision to serve a draft Complaint naming TSG as a reach-and-apply defendant on the eve of the closing might lend itself (as Planet Fitness argues) to an inference of bad faith on AGC's part, because the Engagement Letter did not contractually obligate Planet Fitness to pay a fee to AGC for the successful sale to TSG (other than the $50,000 retainer), it cannot be construed as a breach of the covenant of good faith and fair dealing.   Nor does the evidence support a determination that AGC's intent in serving the Complaint was to scuttle the deal (as opposed to securing payment of a fee to which it, in good faith, believed it was entitled).

16.   In the absence of a binding contractual obligation, Planet Fitness has no duty at law to pay the $3,550,000 fee demanded by AGC in its invoices and Complaint.

17. Because there was no aggravated breach of a contractual obligation or viable claim of fraudulent inducement, there was no violation of the ethical boundaries governing the business-to-business relationship defined in General Laws Chapter 93A.

18. Consequently, judgment will enter for Planet Fitness on AGC's contractual claims (Counts I and II), the claims of fraudulent inducement (Count VI) and negligent misrepresentation (Count VII), and the claim under Chapter 93A (Count V).

19. Notwithstanding, it is undisputed that AGC performed valuable services for Planet Fitness that materially contributed to the successful sale of the company to TSG, including a substantial part of the introductory work that brought TSG to the table as a bidder.

20. It is also clear from the record that Planet Fitness was aware of AGC's efforts and did nothing (in so many words) that would have led AGC to believe that its services were gratuitous and unwanted. [192]

---

[192] This leaves Counts III (unjust enrichment), and more significantly Count IV (quantum meruit). To recover under a theory of quantum meruit, "the claimant must prove: (1) that it conferred a measurable benefit upon the defendant[]; (2) that the claimant reasonably expected compensation from the defendant[]; and (3) that the defendant[] accepted the benefit with the knowledge, actual or chargeable, of the claimant's reasonable expectation." *Finard & Co., LLC v. Sitt Asset Mgmt.*, 79 Mass. App. Ct. 226, 229-230 (2011). Quantum meruit "is a claim independent of an assertion for damages under the contract, although both claims have as a

## ORDER

The Clerk will enter judgment for Planet Fitness on Counts I, II, V, VI, and VII of the Complaint. The court will retain jurisdiction over Counts III and IV consistent with its comments in footnote 192, *supra*.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

common basis the contract itself." *J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789, 793 (1986). This quasi-contract obligation is "created by law 'for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent.'" *Salamon v. Terra*, 394 Mass. 857, 859 (1985), quoting 1 A. Corbin, Contracts § 19 (1963). "The underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party." *Id.*; *see also Harness Tracks Sec., Inc. v. Bay State Raceway, Inc.*, 374 Mass. 362, 367 (1978) (recovery is permitted to prevent one party from receiving a gift of another's services under an unenforceable contract). While it is true, as Planet Fitness argues, that "[a] plaintiff is not entitled to recovery on a theory of quantum meruit where there is a valid contract that defines the obligations of the parties," *Boston Med. Ctr. Corp. v. Sec'y of the Exec. Office of Health and Human Servs.*, 463 Mass. 447, 467-468 (2012), the court is of the view that where, as here, a party accepts gratuitous services outside of a contractual relationship, the rule of *Boston Medical Center* does not apply. However, it is not clear from AGC's briefing what measure of damages the court should apply in making an equitable award under quantum meruit, should it ultimately deem one warranted. *See Liss v. Studeny*, 450 Mass. 473, 480 (2008) ("While a party does not recover on the contract itself under quantum meruit, a court may look to the terms of the underlying contract to help determine appropriate recovery under quantum meruit."). As this issue is not developed in the parties' briefs (nor was it a focus at trial), the court will retain limited jurisdiction over Counts III and IV for sixty (60) days to permit AGC, if it chooses, to submit a particularized demand for damages based on quantum meruit (or as perhaps should be the case, to permit the parties to mediate the dispute between themselves).